Jacob Markowitz, J.
This is a proceeding by the petitioning landlord brought pursuant to subdivisions (a) and (c) of section 2 of the Business Bent Law (L. 1945, ch. 314, as amd. by L. 1952, ch. 417, L. 1957, ch. 452). Subdivision (a) of section 2 of the statute defines “ Business Space ” in include “ on and after March first, nineteen hundred fifty-two, a building in which at least sixty per centum of the total rentable area and sixty per centum of the total number of units formerly used as dwelling space, is lawfully occupied as business space on such date ”. By subdivison (c) of section 2 the emergency rent of business space is provided as follows: ‘ ‘ that if the business space was not used or occupied as business space on June first, nineteen hundred forty-four, the emergency rent shall be the reasonable rent therefor as business space on such date, plus fifty per centum thereof, to be fixed by agreement, by arbitration, or by the supreme court upon the basis of the rent charged on such date for the most nearly comparable business space in the same building or other rental area, or other satisfactory evidence
The question therefore presented here for determination is whether, as the statute requires, 60% of the total rentable area and 60% of the total number of units formerly used as dwellings in this involved building were lawfully occupied as business space on May 9, 1957, the date of the commencement of this *829 proceeding. There being 93 residential units in the building petitioner must establish that 56 units constituting 60% of the total rentable area were used for business purposes when this proceeding was commenced. The building is a 14-story and penthouse structure located at the southwest corner of 57th Street and Seventh Avenue in Manhattan. The ground floor comprises a lobby and three stores. The testimony by petitioner’s witnesses established that from the second floor through the penthouse there have, at various times, been 93 separate units (plus a superintendent’s apartment) which were occupied as residential units. All but two of these units (202 and 203 on the 2d floor) were legally approved by the Department of Buildings as separate residential units in addition to the fact that all 93 of the units were actually occupied for such purpose. Petitioner’s Exhibit 5 is divided into three parts. Part A is a list of units which are still residential. They total 24 units. The leases for these 24 are in evidence. Of these leases, 22 are on the usual apartment house form and provide that the premises may be used as a residence. Of these 22 leases 14 make no other provision in respect of use, that is, the leases permit only residential occupancy. The other 8 leases of the 22 permit additional uses, such as “ studio ”, “ vocal studio ”, “ studio for teaching speech”, ‘‘ teaching of singing” and “ artist’s studio ”. The testimony of the resident manager, or superintendent of the building (Mr. Cozier) however was to the effect that each of the 8 last mentioned apartments was used predominantly for residential purposes. Two leases are on loft forms and one (unit 141) provides for the use of the premises as both dental office and residence. Unit 4A or 403 is strictly residential.
All 24 of the units listed on said Part A of Exhibit 5 were registered with the State Bent Commission and are still so registered.
Part B of Exhibit 5 lists a single apartment, formerly residential but now vacant. The lease thereof permitted only residential use and said unit also was registered with the Bent Commissi on as such. Part C of Exhibit 5 shows that 68 of the 93 units, all of which were formerly residential, are now used for business purposes. The leases of the tenants occupying the spaces listed on Part C show they are all on loft or office forms. The records of the Department of Buildings show that when the building was initially erected in 1917 the second floor was authorized for offices, the third floor for mixed offices and residential use and all floors from the fourth through the penthouse for residential use. Mr. Fisher, petitioner’s architect, testified *830 in respect of alteration repairs filed from time to time in order to conform the building to the condition in which he found it in 1944 when petitioner acquired the building. He further testified to the subsequent conversion of various portions of the building from residential to business use. He further testified that all 93 units on Exhibit 5 (except 202 and 203) were authorized for residential use either by the original plans and certificate of occupancy or subsequent changes; that when a residential apartment becomes vacant it is necessary only to remove the cooking equipment and notify the department that the unit will thereafter be used for business instead of residential purposes and that such use is lawful and all general requirements of law and the Department of Buildings are met to qualify the space for business use; and, that all of the units shown on Part G of Exhibit 5 as being used for business may lawfully be so used under the plans filed and rules of the department.
Mr. Thomas, an inspector of the Department of Buildings, testified on behalf of petitioner that his inspection revealed the occupancy to be in accordance with filed plans; that there is no violation respecting the occupancy of any part of the building and that the conversion since the 1954 certificate of occupancy is lawful and in conformity with filed plans. Mr. Cozier, resident manager of petitioner since 1939 and employed in the building since 1921, testified that all 93 units shown as residential on Exhibit 5 were at some time used residentially and that all the units on Part C are presently used for business purposes, and that the conversion of units on Part C from residential to business use was effected on the dates stated. Exhibit 5 also shows the square frontage of the units in Parts A, B and C and contains a summary showing that the 60% requirement of the statute has been fully met.
Satisfactory evidence was presented by petitioner establishing the reasonable rent of business space on June 1, 1944 on the basis of the rent charged on that date for the most nearly comparable business space. Mr. Tuttle, an expert in the real estate business and real estate values in the area testified that in his opinion 120 West 57th Street was the most nearly comparable business space to that in the building here involved; that the reasonable rental value of business space in 200 West 57th Street as of June 1, 1944 was $2.50 per square foot; that his opinion was based on his experience in the area, inspection of the building, knowledge of general rentals in the area having rented space in the area in those years and having testified in a similar proceeding in respect of premises 157 West 57th Street in which a rental of $2.37 per square foot was based on *831 the ground that the premises were comparable to 120 West 57th Street. He further testified that a unit of particular size in 120 West 57th Street, and a unit of similar size in the building here involved similarly located as to frontage, etc., would be substantially equivalent in rental value in the year 1944 as well as today.
Mr. Schaberg, vice-president and secretary of Manhattan Life Insurance Company, which owns and has its main office right nearby, at 120 West 57th Street, testified he has been with the company 35 years; that he was comptroller of his company in 1943 and 1944 and all real estate of the company and of the premises 120 West 57th Street were then under his supervision and control; that he was an expert in real estate, a member of various real estate boards and appraisers, and that he was personally familiar with the rentals of the area in 1943 and 1944 for business space. His testimony and the documentary evidence established that the second through sixth floors of 120 West 57th Street were used for business purposes in 1943 and 1944 and the floors from 7 through 12 were used residentially; that a portion of the second floor comprising three separate units was rented out at $2.40 per square foot, and the remainder of that floor and floors three through six were occupied by his company at $2.37 per square foot; that this rate of $2.37 was fixed for tax purposes and in compliance with the requirements of the Superintendent of Insurance; that such rates were accepted by the Superintendent of Insurance and that it had been fixed on the basis of his familiarity and knowledge of general rents prevailing in the area and his knowledge of the physical characteristics of the building at 120 West 57th Street, and the one in issue.
The testimony offered by respondents was meager and did not negate petitioner’s proof. Moreover, respondents’ arguments against petitioner’s proof is without substance or merit. The record clearly indicates that floors 7 through 12 were hotel apartments operated with hotel service and therefore the rental naturally was different than that of the ordinary residential unit. Thus respondents ’ argument that the evidence was insufficient because floors 7 through 12 in 120 West 57th Street were rented for almost as much as the business floors was factually incorrect and untenable. Moreover, respondents’ argument is immaterial since the expert testimony on petitioner’s behalf was predicated upon comparability of business space in the two buildings. Unpersuasive also is respondents’ contention that the rent paid by the Manhattan Life Insurance Company was not fixed in an “ arms length transaction.” Actually, the rent *832 paid of $2.37 per square foot was substantially identical with that of $2.40 per square foot charged to strangers as shown by Exhibit 15; Mr. Schaberg testified that it was fixed on the basis of rents generally prevailing in that area at that time for business space. Since more than half of 120 West 57th Street was used for business purposes, and since the rental of the area so used was between $2.37 and $2.40 per square foot, there is warrant for Mr. Tuttle’s testimony that the value of similar space in the subject premises would be $2.50 per square foot. Respondents further urge that petitioner did not prove what rent was paid in the subject premises in 1944 for rents like No. 1 which was occupied for business purposes at that time. This argument is meritless since an insignificant portion of the building was occupied for business purposes on June 1,1944 and therefore an isolated business unit in a building overwhelmingly residential would offer no clue to prevailing business rents. In the comparable building (120 West 57th Street) over half the building was used for business purposes. Respondents offered the testimony of a Dr. Lurie to show what was paid in 1944 for a dentist’s office in 130 West 57th Street. There was no proof whatever to show that that building was comparable in any way to 200 West 57th Street, and no expert, or other proof was offered by respondents on that score.
Factually therefore, on the basis of the record of testimony and documentary proof, I find that petitioner has adequately and substantially proved that more than 60% of the area and more than 60% of the units formerly used as dwelling space have been lawfully converted to business use and that it has established that the reasonable value of each square foot of business space in the building on June 1, 1944 as determined by the rent charged for the most comparable business space in other similar rental areas was $2.50 per square foot. Therefore petitioner is entitled to an order fixing the emergency rent at $2.50 per square foot plus 50% thereof as provided in the statute multiplied by the number of square feet in each apartment. Such rent is fixed as of May 9, 1957, the date of the commencement of this proceeding. The facts likewise establish that as at the time of trial the petitioner has fully complied with the 60% formula as to the total rental area and units in the premises.
Passing to the legalistic phase, respondents contend that petitioner failed to obtain from the Rent Administrator the order required by section 13 of the State Rent and Eviction Regulations and therefore has failed to establish its right to *833 the relief herein sought because, by such failure, each unit converted to business use after May 1, 1955 cannot be deemed ‘ ‘ lawfully occupied. ’ ’ Section 13 reads as follows: Section 13. Commercial or professional renting of controlled housing accommodations on or after May 1, 1955. Any housing accommodation subject to these Regulations which may be rented on or after May 1, 1955, for commercial or professional use shall continue to be subject to control and the landlord may not collect more than the maximum rent until an order is issued by the Administrator exempting the housing accommodation from these Regulations during the period of occupancy by the tenant. Such order shall be issued by the Administrator where he finds that the renting complies with the requirements of state and local authorities and was made in good faith without any intent to evade the Act or these Regulations and shall be effective as of the date of the commercial or professional renting.”
I find and decide that section 13 is not applicable here. The Rent Commission is given authority to adopt rules and regulations necessary or proper to effectuate the purpose of the Act and are effective only to the extent that they are consistent with the statute (Matter of Robinson v. McGoldrick, 201 Misc. 636; Whitmarsh v. Farnell, 273 App. Div. 584, 589; Matter of Batterman v. Finkelstein, 193 Misc. 236). Section 13 was not adopted until April 20, 1955, while section 2 (subd. [c]) was enacted by the Legislature and became effective March 1, 1952, long before section 13 was adopted. I am of the opinion that section 13 does not affect the provisions of the law under which this proceeding is brought. Section 2 (subd. [c]) specifically provides that the emergency rent shall be fixed by agreement, by arbitration, or by the supreme court ” (emphasis mine). The Legislature could not have contemplated the application of section 13 when the section was enacted because section 13 was not then in existence. Manifestly, section 13 was adopted for the purpose of enabling the Rent Administrator to determine the good faith of the conversion from residential to business space in order to avoid abuses. Since, in a proceeding of this kind, the court must determine the same question, to wit, whether 60% of the units have in fact legitimately been converted to business space, it would serve no useful purpose to compel a petitioner landlord to also first obtain from the Rent Administrator the order required under section 13. (See Matter of 114 East 40th Corp. v. Armstrong, 14 Misc 2d 984, wherein the identical issue was presented.)
*834 The foregoing constitutes the decision of the court required by section 440 of the Civil Practice Act. Settle appropriate order computing the amounts in accordance with this determination to be entered against the remaining respondents in the proceeding.